CLARK COUNTY SCHOOL DISTRICT
OFFICE OF THE GENERAL COUNSEL
S. SCOTT GREENBERG, ESQ.
Nevada Bar No. 4622
5100 West Sahara Avenue
Las Vegas, Nevada 89146
Phone: (702) 799-5373
Fax:   (702) 799-5505
Attorney for Defendant

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| RHONDA WILKINSON,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CLARK COUNTY SCHOOL DISTRICT,<br><br>　　　　　Defendant. | CASE NO. 2:05-cv-1083-JCM(RJJ)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter having come before the Court for trial on April 10 and 11, 2012, the Court finds Plaintiff failed to establish her claim of unlawful retaliation under Title VII of the Civil Rights Act of 1964 by a preponderance of the evidence and now enters the following findings of fact and conclusions of law based upon the testimony and exhibits admitted at trial. Plaintiff called herself as her lone witness on April 10th followed by cross-examination of Plaintiff. Plaintiff rested on April 11th without calling further witnesses and Defendant then called Teresa Rodriguez, Jackie Canaday, Julie Kasper and Maureen Powers as witnesses. Plaintiff did not ask any questions on cross-examination of these witnesses and the defense rested. The Court entertained closing arguments and the trial concluded on April 11, 2012.

/ / /

/ / /

I. **FINDINGS OF FACT**

1. Plaintiff Rhonda Wilkinson is an employee of the Clark County School District ("CCSD" or "District") currently employed as an Office Specialist II ("OSII"). Plaintiff has been an OSII since approximately 2001. Plaintiff became an OSII when the District revised job titles. Since the mid-1990s, Plaintiff had been a clerical employee whose job duties were similar to those of an OSII although the job position title was different during those years.

2. CCSD is the public school system for K-12th grade students in Clark County, Nevada and a political subdivision of the State of Nevada. The District's Early Childhood Department ("ECD") generally works with pre-kindergarten age children falling into either category of: (1) Title I low income program, or (2) children with special education needs.

3. Maureen Powers ("Powers") was head of the ECD through approximately 2008. Julie Kasper ("Kasper") was another administrator in the ECD and following Powers' retirement was selected to be the head of the ECD. Both Powers and Kasper have worked the great majority of their careers, if not all, in education with special education students.

4. Between Plaintiff's initial hiring by the District in 1991 and 2002, Plaintiff worked at a number of District work sites throughout the Las Vegas area, including Faye Herron Elementary School, Dell Robison Junior High, Green Valley High School, Clark High School, Rancho High School, Woodbury Junior High, Rose Warren Elementary School and the Arville bus yard. Upon becoming a clerical employee within about a year of her hire, Plaintiff's various transfers, including while an OSII, have been lateral in

1  nature.

2  5. While Plaintiff was working as an OSII, in the District's
3  transportation department at the Arville bus yard around 2002, she
4  complained about the work environment. Plaintiff was offered and
5  agreed to a transfer. That transfer was to the ECD's office known
6  as Siegle.

7  6. Approximately six (6) months after transferring to Siegle,
8  Plaintiff transferred to the Yvonne Atkinson-Gates Child Development
9  Center ("Gates") which is an early childhood facility. There are
10 three facilities like Gates within the ECD serving Title I and
11 special needs students younger than kindergarten age. Teachers and
12 para-professionals serve the students' needs at those facilities.
13 The facilities are also each staffed by a part-time custodian and
14 an OSII. Plaintiff was the OSII at Gates where her duties were
15 primarily to welcome and assist visitors to the facility, some
16 clerical work, answering telephones, filing and directing issues
17 that arose to the proper person/department to be addressed. The
18 part-time custodian at Gates during most of Plaintiff's time there
19 was Simeno "Ty" Edmond.

20 7. In October 2003, a meeting was held between the employees
21 at Gates and the other two similar facilities to discuss custodial
22 issues at the facilities. Kasper attended the meeting. Defendant's
23 Exhibit 530. Plaintiff specifically thanked Kasper for "your
24 support" with the issues at the meeting. Defendant's Exhibit 530
25 at NERC-442.

26 8. A follow-up meeting was held in December 2003 at Gates
27 that included Plaintiff, Mr. Edmond and Powers. Both Plaintiff and
28 Mr. Edmond expressed complaints about how they were being treated

1  by the other. A work schedule was implemented so Plaintiff and Mr.
2  Edmond would not work at the same time; Plaintiff to end at 4:00 pm
3  and Mr. Edmond to begin at 4:30 pm. Plaintiff indicated that was
4  agreeable.

5    9. In Spring 2004, Plaintiff asked Kasper if she could use
6  Gates to meet with a study group for a college class she was
7  enrolled in. Kasper agreed. While not completely consistent,
8  Plaintiff's testimony attempted to portray this study group as
9  meeting only on the weekends when Mr. Edmond would not be present.
10 Kasper testified consistently that she understood the group would
11 meet after Plaintiff's work day therefore the sessions would include
12 times that Mr. Edmond would have been present at Gates.

13   10. On a Friday at the end of July 2004 in the morning,
14 Plaintiff called Siegle and spoke to Kasper. Plaintiff reported
15 that Mr. Edmond was at Gates when he was not suppose to be. Kasper
16 was not working officially that day as she was on a four day work
17 schedule during the summer. Plaintiff indicated she was extremely
18 upset and Kasper went to Gates to see what was happening. The
19 operations department was also called and sent someone to Gates to
20 see what was occurring. Kasper arrived and spoke to Plaintiff.
21 Plaintiff told her Mr. Edmond had been coming to work in the
22 mornings since June when the nine-month schools let out. Plaintiff
23 had not reported this to Kasper or Powers prior to that. Plaintiff
24 also indicated that a day or two before Mr. Edmond had thrown a
25 chair at her. Mr. Edmond was escorted from the building by an
26 operations department employee. Mr. Edmond was off on a leave for
27 a number of weeks after this.

28   11. Kasper informed Powers of the situation. Subsequently

1  Powers instructed Plaintiff to work out of one of the other early
2  childhood facilities and to close Gates for the summer. This was
3  possible because the Gates facility did not generally have students
4  at the time until school restarted.

5      12. Jackie Canaday, an operations department employee, was
6  tasked by the operations department to question Mr. Edmond about
7  Plaintiff's allegation that he threw a chair at her. Ms. Canaday
8  credibly testified that Mr. Edmond stated there was a broken student
9  chair that he was throwing away and that he threw it across the
10 multipurpose room.

11     13. At the time of the chair incident, Plaintiff was on the
12 telephone with Teresa Rodriguez. Ms. Rodriguez is an OSII assigned
13 to one of the other early childhood facilities similar to Gates.
14 Ms. Rodriguez testified credibly that she heard a loud noise, asked
15 Plaintiff what the noise was and Plaintiff responded "hold on" to
16 see what had occurred. Ms. Rodriguez wrote a statement describing
17 what occurred. Defendant's Exhibit 536. Ms. Rodriguez's statement
18 also recounted that Plaintiff asserted Mr. Edmond had thrown a chair
19 from the multipurpose room.

20     14. Plaintiff filed a complaint of harassment with the
21 District's EEO officer, Thomas Rodriguez, following the chair
22 incident which occurred in late July 2004. In her written
23 complaint, Plaintiff claimed to be in fear for her life due to Mr.
24 Edmond's conduct.

25     15. Plaintiff also filed a request for a TRO against Mr.
26 Edmond in which she claimed she was in physical danger from Mr.
27 Edmond. The TRO request was denied and Plaintiff requested the
28 court reconsider her request. Defendant's Exhibit 532.

Plaintiff's court filing alleged "Harassment/Threats, Life in Danger" as the reasons she was seeking the TRO. Defendant's Exhibit 532. Plaintiff also submitted to the court a statement in which she asserted "at any moment he may seriously try to injure me" and "I am seeking this assistance to prevent any physical harm to [sic] family and myself." Defendant's Exhibit 532 at NERC-395.

16. On or about September 16, 2004, Plaintiff contacted Powers' supervisor's office and stated that she had sought the TRO and she was in fear for her safety with Mr. Edmond working at Gates. Defendant's Exhibit 524. Plaintiff did this when she learned that Mr. Edmond had returned to work at Gates. Plaintiff was told she would be transferred from Gates to Siegle based upon her claim that she feared for her safety. Defendant's Exhibit 524. Plaintiff was transferred to work at Siegle which was the work location Plaintiff first worked at when she transferred from the Arville bus yard to the ECD. Powers and Kasper credibly testified that this transfer was solely based upon Plaintiff's claim of being in danger from Mr. Edmond.

17. While working at Gates, Plaintiff complained about being transferred claiming Mr. Edmond should have been transferred instead of her and stating she wished to work at Gates. Plaintiff was transferred back to Gates on approximately October 25, 2004. Plaintiff was informed that her and Mr. Edmond's schedules would be separated by 30 minutes and to contact Powers or Kasper if any issues arose. Defendant's Exhibit 528. Plaintiff was also informed that her complaints had been investigated and the District had taken the actions it believed appropriate. Defendant's Exhibit 528.

- 6 -

1        18.   About November 4, 2004, Plaintiff called Kasper to report that Mr. Edmond was at work before his 4:30 start time after seeing him get out of his car in the parking lot. Plaintiff also called Lt. Ken Young of the CCSD police department to report Mr. Edmond was at work early. Plaintiff wrote a description of this event. Defendant's Exhibit 508. In that written description, Plaintiff stated she called Lt. Young "to let him know what was going on just in case something where to happen." Plaintiff testified she was still in fear for her safety from Mr. Edmond working at Gates.

        19.   Based upon Plaintiff's report about November 4, 2004, that Mr. Edmond was at work before his shift and that she was in fear for her safety, Plaintiff was permanently transferred to work at Siegle effective November 8, 2004. Defendant's Exhibit 529. Kasper and Powers testified credibly that this action was taken due to Plaintiff's continued assertion that she was not safe working at Gates with Mr. Edmond working there.

        20.   Plaintiff was a member of the Education Support Employees Association ("ESEA") which represented the support staff bargaining unit. A collective bargaining agreement ("CBA") between the District and ESEA existed at the relevant time which allowed for the filing of grievances. ESEA filed two (2) grievances after Plaintiff's temporary transfer to Siegle in September 2004 and her permanent transfer to Siegle in November 2004. Plaintiff's Exhibit 26 and Defendant's Exhibit 501A (NERC-54). At the time, Plaintiff's union representative was Rose Brennan. Ms. Brennan forwarded a more detailed complaint to the District about Plaintiff's transfer on November 10, 2004. Defendant's Exhibit 535.

        21.   Plaintiff asserted that under the CBA Mr. Edmond should

1 have been transferred from Gates because he had less seniority than
2 her. Plaintiff referenced Article 36-7 which defines "seniority"
3 as "the length of service in the current job classification."
4 However, Article 36-7 continues: "The Employee at the work site
5 with the least seniority in the job classification to be affected
6 will be identified for involuntary transfer." Plaintiff's Exhibit
7 42M (NERC-85). Plaintiff was an OSII while Mr. Edmond was a
8 custodian therefore they were not in the same job classification.
9 Article 36 also includes Article 36-19 providing: "The safety,
10 welfare, and security of students, staff, public, and district
11 property may necessitate a transfer initiated by the District."
12 Plaintiff's Exhibit 42N (NERC-86).

13     22. Plaintiff testified that Powers threatened her job or
14 career if she complained to an outside entity. Plaintiff testified
15 Kasper was present when Powers made these threats. Plaintiff
16 testified she did not recall the specific date of the claimed
17 threats but such statement was made more than once. Plaintiff's
18 notes state this threat was made during a meeting on October 20,
19 2004. Defendant's Exhibit 507. Kasper and Powers credibly denied
20 that any such threat was made to Plaintiff.

21     23. In the time period September/October 2004, Powers
22 requested that the operations department, the District department
23 supervising custodians, transfer Mr. Edmond to a different work
24 site. Powers did this because Plaintiff wished to work at Gates and
25 that Mr. Edmond be transferred from there. Neither Powers nor
26 Kasper had the authority to transfer Mr. Edmond to a different work
27 site. Powers also spoke to Plaintiff about whether there were other
28 positions she was interested in to see if a transfer could be worked

- 8 -

out. At the time, Plaintiff looked for positions that may interest her and thanked Powers for her assistance but later claimed she did not want to transfer and Powers was pushing her to transfer. Defendant's Exhibit 534. The Court finds Kasper and Powers credibly testified that Powers was trying in good faith to find a solution to the issue of Plaintiff and Mr. Edmond both being assigned to Gates.

24. Plaintiff made a written note of an email she sent to Powers. Defendant's Exhibit 534 (NERC-424). Plaintiff's note states the email was dated October 21, 2004. In the email, Plaintiff thanks Powers for "your concern, support and all that you have done to help me" and the email concludes "Thanks, again! Rhonda W." Defendant's Exhibit 534 (NERC-424). According to the date in Plaintiff's note, this email would have been sent by Plaintiff to Powers the day after Powers supposedly threatened Plaintiff. The Court finds this note, written by Plaintiff, severely undercuts her testimony that Powers threatened her job or career. The Court also finds other evidence and the credible testimony of Kasper and Powers leads to the conclusion that Plaintiff was not threatened by Powers. See Nos. 23, 25, and 26.

25. The grievances filed over Plaintiff's transfers to Siegel and the more detailed complaint of the matter by Ms. Brennan make no mention of Powers allegedly threatening Plaintiff. Plaintiff's Exhibit 26; Defendant's Exhibits 501A and 535. These three (3) documents would have been written after Plaintiff was allegedly threatened by Plaintiff.

26. Sometime before or around April 2005, Plaintiff purchased a new home that sold for in excess of $400,000. Plaintiff had a

1  first and second mortgage for the new home that combined were
2  approximately $400,000.  Defendant's Exhibit 527 at page 15.
3  Plaintiff testified she took $70,000 out the house she was living
4  in to help her purchase the new house.  At the time of purchasing
5  the new house, Plaintiff's annual income from the District would
6  have been in the mid-$30,000 range.  Plaintiff made plans to
7  purchase the new house less than six (6) months from when she
8  alleges Powers threatened her job.

9      27.  Plaintiff submitted a document to NERC in which she
10 discusses a claim that the District was in breach of the lease for
11 the Gates facility.  Defendant's Exhibit 526.  Plaintiff wrote in
12 conclusion "I believe that this plot by CCSD administration is to
13 cover up this matter, so that NERC will not be cognizant of this
14 breach of contract."  In writing this document, Plaintiff was
15 clearly trying to imply that her transfer was to cover up the
16 alleged breach she claim was occurring.  When asked about this
17 document during her testimony, Plaintiff denied she was referring
18 to her transfer.  Plaintiff did not explain what she was referring
19 to if not her transfer.

20     28.  Plaintiff submitted to NERC an email from Powers to her
21 and other office workers at Siegle in which Powers asked the
22 employees not to tell callers they did not know where Powers was
23 when answering telephone calls.  Defendant's Exhibit 509 at NERC-
24 419.  Plaintiff submitted a statement to NERC with the email
25 claiming Powers wanted the employees not to tell the truth about her
26 whereabouts.  Plaintiff wrote in the statement "I am not going to
27 lie for her."  Defendant's Exhibit 509 at NERC-418.  When asked
28 about this document during her testimony, Plaintiff denied she was

1 claiming Powers asked her, or others, to lie.

2     29. The Court does not find Plaintiff's testimony that Powers threatened her, including her job or career, to be credible. This finding is based upon the demeanor of Plaintiff and her testimony, in addition to the other evidence submitted at trial and testimony of Kasper and Powers. See No. 24. Plaintiff's denial of the substance of her own writings as set forth above in Nos. 27 and 28 also lead the Court to determine her testimony was not credible. This is in addition to Plaintiff's submissions to NERC that Powers pressured her even though Plaintiff had written Powers thanking her for support. See Defendant's Exhibit 534.

    30. Plaintiff's duties at Gates were similar to what an office worker would perform such as answering the telephone, filing, assisting visitors and some clerical work. When Plaintiff was transferred to Siegle her duties remained clerical in nature and receptionist type duties which are the duries of an OSII. When she arrived at Siegle in early November 2004, her supervisors arranged for her to work with Mable Hudson and Paula Moore to get familiar with the duties at Siegle. Plaintiff was not directed where to sit in particular, that she could not move or that she needed to be watched.

    31. Kasper and Powers had offices at Siegle. Kapser's duties took her out of Siegle a great majority of the time. Kasper informed Plaintiff that when she was not in the office Plaintiff could use her computer or telephone before Plaintiff was given a permanent work space.

    32. Kasper's office was being moved to Gates. Kasper initially moved her stuff into Powers' office and the two shared

1  that office for a period of time. It took until December 3, 2004,
2  for all Kasper's things to be moved. Defendant's Exhibit 501B.
3  Paula Moore moved into Kasper's former office at Siegle and
4  Plaintiff took over Ms. Moore's desk area by December 8th. Between
5  November 8th and December 7th, Kasper allowed Plaintiff to use her
6  office when Kasper was not there and sometimes while she was there.

7  33. Plaintiff has continued to be an OSII and paid accordingly
8  under the applicable collective bargaining agreement since her
9  tansfer from Gates to Siegle.

10  34. NERC investigated Plaintiff's charge of discrimination and
11  determined there was a legitimate basis for her transfer from Gates
12  to Siegle. Plaintiff asked the EEOC to review NERC's determination
13  and the EEOC adopted NERC's determination. Defendant Exhibits 504
14  and 515.

15  35. Plaintiff claimed that her transfer in November 2004 and
16  work duties at Siegle were demeaning and caused her emotional
17  distress. Plaintiff had been diagnosed as suffering from
18  depression, anxiety and panic attacks prior to 1998. Plaintiff went
19  on FMLA leave in April 2001 for major depression and stress/anxiety.
20  Defendant's Exhibit 511. Plaintiff also went on FMLA leave due to
21  depression and panic attacks in April 2003. Defendant's Exhibit
22  511. Plaintiff went on FMLA leave in May 2005 also asserting major
23  depression and panic attacks. Defendant's Exhibit 511. Plaintiff's
24  FMLA leave in May 2005 occurred approximately four (4) weeks after
25  she claimed a co-worker at Siegle assaulted her by slapping her hand
26  which Plaintiff reported to the police.

27 II.  **CONCLUSIONS OF LAW**
28    1.  Plaintiff exhausted the necessary administrative remedies

with respect to bringing a Title VII retaliation claim by filing a charge of discrimination with NERC/EEOC.

2. The sole claim remaining in this case is a Title VII retaliation claim based upon Plaintiff's permanent transfer to Siegle in November 2004 and her work environment/duties following that transfer. Ninth Circuit memorandum decision dated January 4, 2010.

3. A Title VII retaliation claim requires that the plaintiff establish she: (1) engaged in protected activity, (2) suffered an adverse employment action and (3) a causal link exists between the complaint and the adverse employment action. Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000). Protected activity can either be because one "opposed" a Title VII violation or "participated" in Title VII's remedial scheme. A plaintiff engages in protected activity under the "opposition clause" only if she opposes something one could reasonably believe was unlawful under Title VII. EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1013 (9th Cir. 1983).

4. In Burlington Northern and Santa Fe Railway v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court held that to be actionable for a retaliation claim the alleged adverse employment action must be "materially adverse" which are those acts that would dissuade a reasonable employee from asserting a charge of discrimination. Id. at 57. The Court emphasized "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id.

5. Neither Plaintiff's transfer to Sielge from Gates nor her work environment there constitute adverse employment actions as both

- 13 -

1  were to alleviate what Plaintiff perceived as a dangerous work
2  environment at Gates due to Mr. Edmond's presence.
3       6.   No causal link existed between any protected activity and
4  Plaintiff's transfer to Siegle, or her work duties/environment
5  there. The reason for her transfer was because Plaintiff expressed
6  she was not safe working at Gates which is a legitimate, non-
7  retaliatory basis for the employment action. Powers and Kasper
8  arranged for Plaintiff to observe two other employees upon her
9  permanent transfer so she could become familiar with the work duties
10 at Siegle and made arrangements to reorganize the offices so that
11 Plaintiff could have a work station. These actions were also
12 legitimate work place decisions and not unlawful acts of
13 retaliation.
14      7.   While Plaintiff would have preferred to remain working at
15 Gates and that Mr. Edmond have been transferred, Title VII does not
16 dictate which employee an employer transfers if there is a claim of
17 workplace danger.
18      8.   None of the CBA sections Plaintiff referenced required the
19 District to transfer Mr. Edmond instead of her. Article 36-19
20 allows the District to initiate an employee transfer when there is
21 an issue of staff safety, welfare or security and the CBA provisions
22 leave it to the District's management judgment to decide which
23 employee to transfer.
24 / / /
25 / / /
26 / / /
27 / / /
28 / / /

9. Plaintiff failed to establish all the required elements for a Title VII retaliation claim; therefore, judgment is to be entered in favor of the Clark County School District in this matter.

DATED: April 18, 2012

_____
U.S. District Court Judge

Respectfully submitted,

CLARK COUNTY SCHOOL DISTRICT
Office of the General Counsel

By: _____/s/_____
S. SCOTT GREENBERG
Nevada Bar No. 4622
5100 West Sahara Avenue
Las Vegas, Nevada 89146
Attorneys for Defendant